UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRIAN J. COURNOYER,<br><br>                    Plaintiff,<br><br>    vs.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>                    Defendant. | 4:15-CV-04084-LLP<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff, Brian J. Cournoyer (Mr. Cournoyer) seeks judicial review of the Commissioner's final decision denying him payment of benefits under Title II and Title XVI of the Social Security Act.[1] Mr. Cournoyer has filed a complaint

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI).  In this case, Mr. Cournoyer filed his application for Title II and Title XVI benefits.  AR 21, 223-36.  His coverage status for SSD benefits expired on September 30, 2012.  AR 21, 275.  In other words, in order to be

and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Mr. Cournoyer asks the court to remand his case to the Social Security Administration for further hearing. The matter is fully briefed and has been referred to this magistrate judge for a report and recommendation. For the reasons more fully explained below, it is respectfully recommended to the district court that the Commissioner's decision be REVERSED and REMANDED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). Judge Lawrence L. Piersol referred this matter to the magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and Judge Karen E. Schreier's standing order dated October 16, 2014.

## STIPULATED FACTS[2]

### A.    Administrative Proceedings.

This action arises from plaintiff Brian J. Cournoyer's application for SSDI and SSI benefits protectively filed on February 24, 2012, alleging disability since October 31, 2007, due to bilateral carpal tunnel, broken right ankle with

---

entitled to Title II benefits, Mr. Cournoyer must prove he is disabled on or before that date.

[2] The stipulated facts were agreed upon and submitted by the parties. See Doc. 10. The paragraph numbers have been deleted and a few headings have been altered by the Court. A few grammatical and/or stylistic changes have been made. Otherwise, the stipulated facts are recited in this opinion from the parties' submission.

2

screws and plate, other fibromatosis of muscle, ligament, and fascia of the left heel, bilateral wrist pain, and a permanent back injury. AR 223, 230, 279, 315-16 (citations to the appeal record will be cited by "AR" followed by the relevant page or pages).

Mr. Cournoyer's claim was denied initially and upon reconsideration. AR 126, 131, 134. Mr. Cournoyer then requested an administrative hearing. AR 137.

Mr. Cournoyer's administrative law judge hearing was held via video on October 29, 2013, by the Honorable Lyle Olson ("ALJ"). AR 43. Mr. Cournoyer was represented by different counsel during the hearing. AR 43.  An unfavorable decision was issued on November 19, 2013. AR 18.

At step one of the evaluation, the ALJ found Mr. Cournoyer had not engaged in substantial gainful activity ("SGA") since the alleged onset date of October 31, 2007.[3] AR 23.

---

[3] The Social Security regulations set forth a sequential method of evaluating disability claims. 20 CFR 404.1520(b). The first step is to determine whether the claimant is engaging in substantial gainful activity. If so, the claim is denied. If not, the second step is to determine whether the claimant has a severe impairment, one that establishes more than only slight abnormalities that significantly limit any basic work activity. 20 CFR      § 404.1521; SSR 85-28. If not, the claim is denied. If a severe impairment is present, the third step is to determine whether it meets or equals one of the impairments listed in 20 CFR Part 404, Subpart P, App. 1.  20 CFR § 404.1520(d). If it does, a finding of disability is directed. Id. If not, the fourth step is to determine whether the claimant has an impairment that precludes the performance of past relevant work. 20 CFR § 404.1520(f). If not, the claim is denied. Id. If so, the fifth step is to determine whether the claimant's impairments prevent the performance of any other work, considering residual functional capacity, age, education, and work experience. 20 CFR § 404.1520(g).

At step two, the ALJ found Mr. Cournoyer had severe impairments including obesity (5'8" and 264 pounds); asthma; carpal tunnel syndrome, bilateral (status post left carpal tunnel release); status post left middle trigger finger release; status post left ring trigger finger release; status post right shoulder subacromial decompression; plantar fasciitis and very early osteophytic-type change along the lateral side of the first metatarsophalangeal joint, left foot (considered severe only when viewed in combination with obesity); and a history of triangular fibrocartilage complex tear, right hand and wrist.  AR 24.

The ALJ found Mr. Cournoyer's alleged back pain was not a medically determinable impairment because Mr. Cournoyer's back was adjusted by manual manipulation and he was told to return if needed, but the record did not document he returned for further treatment, nor was there a diagnosis of back impairment in the record from an acceptable medical source. AR 24.

The ALJ found Mr. Cournoyer's alleged cognitive impairment was not a medically determinable impairment because the record did not contain a valid IQ score, cognitive testing, or treatment notes from claimant's physicians showing concern of a cognitive impairment. AR 24. In addition, the ALJ noted Mr. Cournoyer was capable of unskilled work and had testified he passed qualification testing to be a certified welder, which is considered skilled work. AR 24. The ALJ also noted the record did not document any diagnosed cognitive impairments. AR 24.

4

At step three, the ALJ found Mr. Cournoyer did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App. 1 (20 CFR 404.1520(d))("the Listings"). AR 24. To support his decision, the ALJ noted Mr. Cournoyer's testimony that he vacuumed, cooked, did laundry, and mowed the lawn without difficulty. AR 24. The ALJ cited medical records showing Mr. Cournoyer had a normal gait, good balance, good coordination, bilateral wrist motion with no pain, and a demonstrated ability to make a fist and extend all fingers. AR 24-25.

The ALJ determined Mr. Cournoyer had the residual functional capacity ("RFC") to perform:

> less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. The claimant can stand and/or walk (with normal breaks) for a total of about 4 hours in an 8-hour day but should not do so on uneven terrain. The claimant must never engage in the use of vibrating hand tools with either the right or left upper extremity. The claimant can occasionally reach overhead and occasionally engage in push/pull activities with the bilateral upper extremities. The claimant can frequently handle, finger and feel with bilateral hands. The claimant can occasionally engage in operating foot controls with the bilateral lower extremities. The claimant can occasionally climb ramps, climb stairs, balance, stoop, kneel and crouch. The claimant should avoid concentrated exposure to humidity and wetness, extreme cold and extreme heat. The claimant should never climb ladders or scaffolds, crawl, work at unprotected heights or work with dangerous moving mechanical parts.

AR 25.

The ALJ's credibility finding regarding Mr. Cournoyer's statements concerning the intensity, persistence, and limiting effects of his symptoms was

5

that they were not "entirely credible for the reasons explained in this decision." AR 26.

The ALJ considered the opinions of the state agency medical consultants, giving their opinions "some weight" regarding physical limitations, but he found Mr. Cournoyer further limited in his ability to crawl, climb ramps and stairs due to his fasciitis in combination with obesity, and because of his restricted use of his upper extremity.  AR 29.

The ALJ stated, "It is important to note that the record does not contain any definitive statement from any of the claimant's treating or examining physicians. Their silence is deafening as to the issue of disability." AR 29.

The ALJ stated he "accepts the claimant's treatment records support his complaints of pain in his upper extremity.  Therefore, the [ALJ] limited the claimant to only frequent manipulation with his upper extremities." AR 30. But the ALJ found Mr. Cournoyer was not as limited as alleged because his daily activities of living, including his ability to fish, change the oil in his car, vacuum, make the bed, cook, clean, and care for his personal needs and the personal needs of his children, supported his ability to perform work within the light exertional range. AR 30. The ALJ further found Mr. Cournoyer was not as limited as alleged because the record did not include any medical opinions from any of the claimant's physicians stating he had any limits due to his physical impairments.  AR 30.

Based on the RFC determined by the ALJ, the ALJ found at step four that Mr. Cournoyer was unable to perform his past relevant work.  AR 30.

Relying on testimony from a vocational expert, the ALJ found at step five Mr. Cournoyer could perform other work existing in significant numbers, including Inspector/Hand Packager, Dictionary of Occupational Titles ("DOT") Code 559.687-074; Cashier, DOT Code 211.462-010; and Electronics Worker, DOT Code 726.687-010. AR 30-31. The ALJ noted the vocational expert's testimony was not consistent with information contained in the DOT, but the vocational expert's 22-year experience doing job analysis and vocational rehabilitation supported Mr. Cournoyer's ability to perform the identified jobs even with a need to sit 4 hours out of an 8-hour day.  AR 31.

Mr. Cournoyer timely requested review by the Appeals Council on December 23, 2013 (AR 14), and submitted additional new and material evidence, which the Appeals Council considered AR 1-2, 4.

The Appeals Council denied Mr. Cournoyer's request for review on April 1, 2015, making the ALJ's decision the final decision of the Commissioner. AR 1. Mr. Cournoyer then timely filed this action.

**B.    Plaintiff's Age, Education, and Work Experience.**

Mr. Cournoyer was born April 21, 1974, making him 39 years old at the time of the decision. AR 223. Mr. Cournoyer's education ended in 1989 in the 8th grade, and he attended special education classes from kindergarten through the 8th grade. AR 280.

The ALJ relied on the vocational expert who identified Mr. Cournoyer's past work as a dump truck driver, construction laborer, and hand packager. AR 340.

7

Mr. Cournoyer identified his recent work attempts as ringing a bell for Salvation Army in November 2012, hanging clothes at Goodwill Industries in March 2012, and doing temporary work in September 2011, but these were not considered SGA. AR 23, 329.

Mr. Cournoyer's work attempt at Goodwill Industries was arranged through South Dakota Vocational Rehabilitation Services. AR 303-12. When meeting with South Dakota Vocational Rehabilitation Services, Mr. Cournoyer reported his ankle prevented him from doing the dishes two days ago, but "[m]ost of the time this is not a problem." AR 303. He also reported he would like to work part time with or without Social Security benefits. AR 303. On February 23, 2012, Mr. Cournoyer's vocational rehabilitation evaluator indicated Mr. Cournoyer did well on his job and was working at a competitive rate. AR 306. During his employment at Goodwill Industries, Mr. Cournoyer missed three days of work— two days due to bad weather and vehicle break down, and one day due to heel pain. AR 306. With regard to his heel pain, Mr. Cournoyer said he would get a cortisone shot for his heel and obtain surgery if it would help. AR 306.

Based on his six weeks of part-time work at Goodwill Industries, the vocational rehabilitation evaluator concluded Mr. Cournoyer was "not ready for competitive employment at this time...[and] should continue working to obtain Social Security Disability...." AR 306, 311. Mr. Cournoyer received excellent or acceptable ratings in 22 of 24 categories. AR 310-11.

C.    **Relevant Medical Evidence.**

   1. **Sanford Family Medicine Clinic:**

The earliest treatment note in the appeal record from Bruce H. Schulz, MD, Mr. Cournoyer's primary care provider, is July 10, 2009.  Mr. Cournoyer was seen for bilateral hand pain, which had progressively grown worse, and was exacerbated with use. AR 423. Mr. Cournoyer indicated ibuprofen gave some improvement in his hand pain. AR 423. He denied numbness, tingling, stiffness, weakness, or difficulty using his hands. AR 423. Dr. Schulz noted prior carpal tunnel surgery on the left hand in 2006.  Mr. Cournoyer was told he needed surgery on the right hand also, and Mr. Cournoyer had ongoing intermittent symptoms since the surgery. AR 423. A carpal tunnel exam was negative on both sides, but minimal swelling was noted in both hands. AR 423. A night splint was recommended and Mr. Cournoyer was advised to begin a daily exercise program and to attempt to lose some weight. AR 424.

Mr. Cournoyer was seen again on September 21, 2009, and he reported the edema in his hands and feet felt better. AR 428. The examining doctor encouraged Mr. Cournoyer to continue to follow up with Dr. Leeburton for those conditions. AR 428. The examining doctor also noted Mr. Cournoyer was taking medications as instructed but was not monitoring his blood pressure at home. AR 428.

Mr. Cournoyer was seen again on September 28, 2009, following a left knee sprain injury. AR 440. He reported severe throbbing pain and some swelling was noted. AR 440. Mr. Cournoyer's gait was antalgic, and an x-ray

revealed normal joint spacing and no fracture or dislocation. AR 440, 444. In addition, his hips and contralateral knee were within normal limits. AR 440. He was given a knee immobilizer and Tylenol #3 was prescribed for pain, which was later changed to Lortab when the pain was unresolved. AR 415-16, 442. On November 5, 2009, Mr. Cournoyer was again seen for knee pain and an MRI was obtained, which showed findings consistent with a sprained MCL, but he presented with no complaints other than knee pain. AR 453, 550-51.

Mr. Cournoyer was seen on July 22, 2010, for a pre-operative evaluation prior to a planned right shoulder arthroscopy. AR 480. Mr. Cournoyer reported ongoing right shoulder pain worsening over a 6-7 month period. AR 481. He also reported chronic pain in his right ankle due to previous trauma/surgery. AR 482. The exam revealed positive findings in the right shoulder, and surgery was approved as planned. AR 483-84. Mr. Cournoyer had a normal station, gait, and reflexes. AR 483.

Mr. Cournoyer was seen on October 18, 2010, for another pre-operative evaluation prior to a planned right shoulder arthroscopy and right carpal tunnel release. AR 504. He had a normal gait, station, and reflexes with positive shoulder findings. AR 507. Surgery was again approved with similar findings. AR 508.

Mr. Cournoyer was seen on March 24, 2011, for left shoulder pain, reporting severe pain aggravated by movement and overhead activities and relieved with rest. AR 524. The exam revealed positive shoulder impingement signs, impingement syndrome was diagnosed, and rest, ice packs, and

10

prescription NSAID was given with a recommendation for range of motion exercises. AR 524.

Mr. Cournoyer was seen on July 11, 2011, for localized left heel pain which began upon weight bearing the first thing each morning, with less pain through the day. AR 530. Mr. Cournoyer had not tried any medication. AR 530. He had not been performing range of motion exercises regularly and reported ongoing left shoulder pain with range of motion, which had not improved with Mobic a few months earlier. AR 530. The exam revealed minimal point tenderness in the left heel, without masses, deformity, or edema, and positive shoulder impingement signs of the left shoulder. AR 530. He had no numbness or tingling in the hands. AR 530. An x-ray of the left shoulder was normal, with no sign of fracture or dislocation and normal joint spacing. AR 530. The assessment was plantar fasciitis, shoulder pain, and impingement syndrome, shoulder. AR 530. Dr. Schulz recommended NSAIDs, cold packs, reduced walking on hard surfaces, arch supports, and, if not greatly improved in the next 1-2 weeks, a Podiatry referral. AR 531. For Mr. Cournoyer's shoulder, he recommended range of motion exercises and to consider steroid injection if not improving. AR 531.

Mr. Cournoyer saw Dr. Schulz again on August 24, 2011, due to his chronic right ankle and leg pain since surgical repair following an ankle fracture 2-3 years ago and ongoing left heel pain. AR 537. Exam of the right ankle revealed some chronic deformity from surgery with no acute swelling or warmth, and the foot exam revealed tenderness to palpation over the insertion

11

of the plantar fascia into the heel. AR 537. Dr. Schulz referred Mr. Cournoyer to orthopedics for both conditions. AR 537.

The last treatment record present in the file at the time of the November 2013 ALJ decision was an appointment on November 1, 2011, when Mr. Cournoyer was seen for asthmatic bronchitis. AR 543.

The record did contain an "After Visit Summary" for a June 28, 2012, exam, which documented continued treatment with Dr. Schulz, but no treatment records past November 1, 2011 were in the record. AR 553.

### 2. Sanford Family Medicine Clinic (Submitted to the Appeals Council):

Although the treatment records are not clear, it appears Mr. Cournoyer was prescribed Tramadol (Ultram) for bilateral hand pain some time prior to April 2012. AR 727, 729.

Mr. Cournoyer was seen by Dr. Schulz on June 28, 2012 for right hand pain, to have his bilateral great toenails checked, and to obtain refills of medication for arthritis and asthmatic bronchitis. AR 731. He also complained that his left 3rd finger gets caught with range of motion. AR 731. Mr. Cournoyer reported pain in both hands, but no numbness. AR 731. Examination revealed triggering of the left 3rd finger, bilateral positive tinel and phalen signs, and thickening and dystrophic changes of multiple toenails. AR 732. Dr. Schulz prescribed pain medications, including meloxicam (Mobic) and Tramadol (Ultram), bilateral wrist splints, and referred Mr. Cournoyer to orthopedics. AR 732, 736.

12

Mr. Cournoyer was seen on November 1, 2012, due to a Hepatitis C positive screen when donating plasma, and he also had a cough and complained of left foot numbness. AR 757.

Mr. Cournoyer was seen again on November 27, 2012, again complaining of numbness/tingling in his left foot and leg. AR 771. He also reported some back pain, for which he had been treating with a chiropractor. AR 771. Treatment helped for a day, but the back pain returned. AR 771. On examination, Mr. Cournoyer had equal and full lower extremity strength and reflexes. AR 771. Dr. Schulz diagnosed lumbar pain with radiation down the left leg and recommended over the counter pain medication, ice/heat, and range of motion exercises. AR 772. Dr. Schulz also reviewed the importance of good posture, lifting technique, sleeping position, and footwear. AR 772.

On April 22, 2013, Dr. Schulz requested that Mr. Cournoyer's noncompliance with suggested follow-up instructions be documented. AR 803.

Mr. Cournoyer was seen on May 16, 2013, with complaints of numbness/tingling into his left hand with ring and pinky finger numbness, ongoing hand and wrist pain despite prior carpal tunnel surgeries, and some numbness/tingling occasionally in the left foot. AR 810. Examination revealed positive tinel and phalen's at left wrist, and he was advised to follow up with orthopedics. AR 811. Mr. Cournoyer had equal and full lower extremity strength bilaterally and intact sensation and reflexes. AR 811. Mr. Cournoyer continued to take tramadol (Ultram) for pain, which had been started early in 2012. AR 727, 736, 745-46, 748, 750-56, 761, 768-70, 776, 779-802, 804-07,

13

811; see also AR 365 (referring to Tramadol being prescribed by the orthopedic surgeon for hand pain in February 2012).

Mr. Cournoyer's treating physician, Dr. Schulz, was contacted and provided a medical source statement ("MSS") dated January 6, 2015, documenting Mr. Cournoyer's limitations based on his medical history, clinical findings, laboratory findings, diagnoses, and treatment prescribed and response. AR 857. First, Dr. Schulz confirmed his treatment notes documented Mr. Cournoyer's current condition as it existed since October 31, 2007; that the limitations he was providing were to reflect Mr. Cournoyer's ability to sustain full-time work; and that full-time, sustained work may limit Mr. Cournoyer by exacerbating his symptoms to a level greater than reflected in treatment notes for periods when he was not working or attempting to work on a full-time, sustained basis. AR 857.

Dr. Schulz stated in the MSS that if Mr. Cournoyer attempted full-time, sustained work he would be limited to likely less than two hours per workday standing or walking, limited to lifting less than 10 pounds frequently and 20 pounds occasionally, and limited to only occasional repetitive fingering, handling, and reaching. AR 858. Dr. Schulz also stated if Mr. Cournoyer attempted full-time, sustained work his limitations would likely cause absences in excess of two days per month, and that due to pain or other symptoms Mr. Cournoyer's ability to sustain pace or concentration would decline during a full-time workday to the point where he would only be 75% or less of normal pace by the last two hours of a workday. AR 859. Dr. Schulz indicated these

14

limitations had existed since the alleged onset date of October 31, 2007. AR 859. Dr. Schulz explained the stated limitations were based on the patient working a job with active duties and may not reflect how he might feel doing sedentary tasks. AR 859. Dr. Schulz also noted Mr. Cournoyer had ongoing treatment/evaluation of his back and hands which could impact his future ability to work. AR 859.

### 3. Sanford Orthopedic and Sports Medicine:

Mr. Cournoyer was seen on January 5, 2009, for left hand numbness and right leg swelling. AR 353. Mr. Cournoyer had a normal gait and was in no apparent distress, but reported numbness in his left hand, which had previously had carpal tunnel release surgery with repetitive motion increasing his symptoms. AR 353. Stability, motor strength, and range of motion was normal for the left wrist and elbow, but the orthopedist noted some limitation in his right ankle motion and a mass formation proximal to the ankle medially with mild tenderness to palpation of the mass. AR 353. X-rays showed some backing out of the distal fibula screws in the ankle, but no obvious signs of pathology of the left hand. AR 353. An EMG was ordered for his left wrist and an ultrasound for the mass in his ankle. AR 353, 358.

Mr. Cournoyer was seen on January 27, 2009, for right leg swelling and left hand pain. AR 352. The leg swelling had resolved, but he had sharp left hand pain, mild in nature, and an EMG did not show peripheral compression, so no follow up was scheduled unless pain worsened. AR 352. An ultrasound showed no obvious pathology. AR 352.

15

Mr. Cournoyer was seen on April 6, 2010, for complaints of right hand numbness and right shoulder pain. AR 351. Examination revealed slightly reduced range of motion of the shoulder, positive impingement sign, and tenderness to palpation, but normal motor strength. AR 351. Examination of the right wrist revealed normal stability, motor strength, range of motion, and grossly intact light touch, but prior EMG showed mild carpal tunnel on the right. AR 351. An MRI of the shoulder was ordered. AR 351.

Mr. Cournoyer was seen on April 20, 2010, for right shoulder pain and right carpal tunnel syndrome. AR 350. An MRI of the shoulder revealed supraspinatus tendonitis and a cortisone injection was given. AR 350, 356-57. Surgery was recommended for his carpal tunnel. AR 350.

Mr. Cournoyer was seen on May 13, 2010, for right shoulder pain and reported that a cortisone injection on April 10, 2010, had provided no pain relief. AR 348. Examination revealed normal right shoulder range of motion, strength, and stability, but he had a significantly positive impingement sign and surgery was recommended. AR 348. Mr. Cournoyer had a normal gait and grossly intact light touch. AR 348.

Mr. Cournoyer was seen following right shoulder scope decompression surgery and open carpal tunnel release surgery on the right on November 11, 2010, complaining of pain. AR 346. An x-ray of the shoulder showed AC joint arthrosis. AR 354. He was restricted to lifting no more than six pounds with his right upper extremity for the next month. AR 346.

16

Mr. Cournoyer was seen again by an orthopedic surgeon on December 9, 2010, for a six-week follow-up appointment following right shoulder scope decompression surgery and open carpal tunnel release surgery on the right. AR 345. Examination revealed normal range of motion, strength, and stability of the wrist, but the hand was cramping. AR 345.

Mr. Cournoyer was seen on September 20, 2011, complaining of left heel pain, which had started a few months earlier. AR 367. He had been seen a month earlier and was prescribed anti-inflammatories and shoe inserts, which had not provided relief. AR 367. He reported symptoms starting in the morning when he first gets up and after he sits then gets back up with symptoms increasing the more he is on his feet. AR 367. Mr. Cournoyer also reported aching and throbbing of the lower leg near the site of his earlier fracture and complained of hand issues. AR 367. His heel was diagnosed as plantar fasciitis and he was prescribed a nighttime splint, a shoe insert, physical therapy, and a steroid injection, the last of which was declined. AR 368. Mr. Cournoyer was advised to seek out a referral to Dr. Vandemark for his hand issues. AR 367. Mr. Cournoyer had appropriate bilateral sensation and good muscle tone and strength. AR 367. He did not wish to undergo steroid injections. AR 368.

Mr. Cournoyer was seen by Dr. Vandemark on October 5, 2011, with complaints of bilateral hand pain and numbness, as well as triggering of his left ring finger. AR 376. Strength, tone, and sensation were decreased with pulses intact. AR 376. Tinel and phalen signs were positive, as was median nerve compression, and bilateral nerve conduction was planned. AR 377-78.

17

Mr. Cournoyer had a normal gait and reflexes with good balance and coordination. AR 376. The test results came back on October 12, 2011, and showed normal median nerve conduction with slight slowing of the ulnar nerve. AR 383. At that time, Dr. Vandemark diagnosed Mr. Cournoyer with bilateral cubital tunnel and injected his right carpal tunnel. AR 383.

Mr. Cournoyer was seen on January 11, 2012, for clicking of his left middle finger. AR 391. Mr. Cournoyer was status post trigger finger release and had bilateral carpal tunnel. AR 391. Examination revealed a well-healed incision in the finger, but painful clicking with finger motion, showing active triggering and tenosynovitis. AR 391-92. The assessment was tendonitis of the left middle finger, bilateral cubital tunnel, and carpal tunnel syndrome. AR 393. Mr. Cournoyer's finger was then injected. AR 393. Mr. Cournoyer had good balance and coordination with normal reflexes, sensation, pulses, and gait. AR 391. His strength, sensation, and tone were intact. AR 391.

Mr. Cournoyer was seen again on February 22, 2012, for left heel foot pain following physical therapy. AR 400. A steroid injection was recommended and given two days later when Mr. Cournoyer was not working. AR 400, 407.

Mr. Cournoyer was seen on September 18, 2012, for right wrist pain and left middle finger pain. AR 556. He had a normal gait, good balance and coordination, and intact sensation, pulses, and reflexes. AR 557. He reported pain and swelling with use of his right hand, and pain and catching of the left middle finger, but he had full wrist motion and intact strength and tone. AR 556-57. An MRI of the wrist was ordered and surgery was recommended

18

again on the middle finger. AR 557. The MRI showed a TFCC[4] tear and the wrist was injected on September 25, 2012. AR 564, 574-75.

Mr. Cournoyer was seen on January 28, 2013, and reported that the injection in his wrist had not helped much, and he also complained of pain in both hands at the PIP joint. AR 581. He denied carpal tunnel symptoms, but reported back pain and foot pain. AR 581. Examination revealed right wrist tenderness over the TFCC with some swelling, as well as swollen and tender PIP joints on both hands, and Mr. Cournoyer had normal gait, reflexes, pulses, and sensation. AR 581-82. A rheumatology referral was planned. AR 582.

Mr. Cournoyer was seen on July 22, 2013, following a rheumatology exam at which he said he was told he had "arthritis" and complained of pain and catching in the left middle and ring fingers, worse the past several months, but stated that his right wrist was doing well. AR 603-05. Examination revealed swelling in both fingers, active triggering present, and tenosynvitis, and normal gait, good balance and coordination, and intact reflexes, sensation, and pulses. AR 603-05. Surgery was planned for both fingers. AR 605. Mr. Cournoyer also complained of wrist pain stating the right was doing well, but the left had pain rated 8/10 which was achy and throbbing, starting in his fingers and going up to his left elbow. AR 605. The treatment note referenced a rheumatology visit on February 13, 2013. AR 605.

---

[4] TFCC is an acronym for triangular fibrocartilage complex.  It "describe[s] the ligamentous and cartilaginous structures that suspend the distal radius and ulnar carpus from the distal ulna … The TFCC is the major ligamentous stabilizer of the distal radioulnar (DRU) joint and the ulnar carpus."  http://emedicine.medscape.com/article/1240789-overview (last checked January 13, 2016).

Following surgery on his fingers Mr. Cournoyer was seen on August 15, 2013, complaining of his right wrist locking up, a bump on the dorsal wrist with minimal pain, and continued left radial wrist pain. AR 626. Mr. Cournoyer was taking Tramadol for pain. AR626. Mr. Cournoyer could fully extend all his fingers with no catching of the ring fingers, and he could make a composite fist. AR 626. He had good active wrist motion with no pain. AR 627. He was told to gradually resume all activities without restrictions and to follow up in one month. AR 627.

Mr. Cournoyer was seen on September 16, 2013, to follow up on the trigger release finger surgeries and he complained of hand pain and swelling, as well as pain in his left elbow. AR 634-35, 640. Examination revealed healed wounds with some tenderness, and Mr. Cournoyer had a positive wrist extension test. AR 634. At that time, he was diagnosed with left tennis elbow. AR 634. He had intact motor function and denied numbness or tingling. AR 634.

### 4. Chiropractor Records – Alan J. Geffre, DC:

Mr. Cournoyer was seen for chiropractic care on November 23, 2012, complaining of left low back pain, mild sacroiliac nerve radiculopathy, and tightness in the cervical and upper thoracic area on the left. AR 577. The assessment was cervical thoracic and low back strain with facet inflammation and muscle tightness. AR 577. Mr. Cournoyer denied radiculopathy in his upper extremities. AR 577. Mr. Cournoyer reported that manual manipulation provided subjective relief and that he would return as needed. AR 577. On his

20

Patient Information Sheet Mr. Cournoyer stated under back/spinal problems, "10% permanent disability in my back." AR 579.

**5. Sanford Rheumatology Clinic (Submitted to the Appeals Council):**

Mr. Cournoyer was referred for a rheumatology exam on February 13, 2013, due to bilateral hand/wrist pain following carpal tunnel surgery in 2010, the popping/swelling of hands, and pain caused by moving hands. AR 702. He noted that his surgery resolved the tingling and burning he had experienced. AR 702. A comprehensive joint examination was within normal limits with no active inflammation of small joints of the hands. AR 704. The exam record comments on swelling over the wrist, but is unclear whether swelling was present or not. AR 704. Examination also revealed pain along palmar surface, worse with finger extension, and positive for scattered tender points. AR 704. The rheumatologist reviewed the radiologist's MRI impressions, which were subchondral sclerosis and bone marrow edema of the ulnar aspect of the lunate suggestive of underlying impaction syndrome, small ossicle adjacent to the ulnar styloid with chronic thickening and fraying of the peripheral fibers of the triangular fibrocartilage complex, small radial sided TFCC tear with irregularity of the radial attachment of the palmar radioulnar ligament, chronic thickening of the UT ligament with associated synovitis in the pisotriquetral recess, and status post carpal tunnel release. AR 643, 705. The rheumatologist's assessment states that the bilateral wrist/hand pain was suspected to be a primary degenerative arthritis without an underlying inflammatory arthropathy, and also noted depression/anxiety was active with

21

increased personal stressors. AR 705. Lab tests showed low vitamin D levels, which could contribute to joint pain, so vitamin D supplements were prescribed. AR 714.

### 6. Sanford Physical Med. Rehab. Specialists (Submitted to the Appeals Council):

Mr. Cournoyer was seen at the physical medicine and rehabilitation clinic on September 25, 2013, due to low back and left-sided leg pain, which he reported had been occurring for about eight months, but he did not recall an inciting event. AR 839. He reported that the day of the exam he had no pain, but it gets 7 to 8/10 with walking, bending, and twisting, and gets somewhat better with rest. AR 839. He reported having tried chiropractic treatment and Tramadol. AR 839. Examination revealed mild tenderness to palpation over the lumbar paraspinal muscles and pain in his back with straight leg raise. AR 840. He walked without an assistive device and could perform tandem gait and heel and toe walking without difficulty. AR 840. Mr. Cournoyer had normal lower extremity strength and intact sensation; an AP thrust did not cause typical pain symptoms. AR 840. Review of a February 13, 2013, hand x-ray showed mild degenerative arthritis in the 1st and 3rd metacarpal joints and normal PIP joints. AR 840. The physical medicine specialist diagnosed left lumbar radiculitis without evidence of neurologic compromise and potential history of alcohol abuse, and he recommended physical therapy at the Spine Center. AR 840, 849, 854-55. On October 23, 2013, Mr. Cournoyer reported that he was doing 25% better since his appointment. AR 852.

**7. State Agency Assessments:**

The state agency physical experts evaluated the file at the initial level on May 25, 2012, and again at the reconsideration level on October 24, 2012, and both times found that Mr. Cournoyer had severe impairments including disorders of muscle, ligament, and fascia, and non-severe impairments including carpal tunnel syndrome, fractures of lower limb, and substance abuse. AR 84, 88, 95, 99, 107, 111, 119, 125.

The expert at the initial level found Mr. Cournoyer limited to lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking 4 hours; sitting 6 hours; limited to occasional push/pull with both lower extremities; limited to occasional climbing ramps, stairs, ladders, ropes, and scaffolds; and occasional crawling and bilateral overhead reaching. AR 86-87, 97-98. The expert found no limitations in balancing, stooping, handling, fingering, or feeling. AR 87, 98.

The expert at the reconsideration phase found identical limits, except he found Mr. Cournoyer could frequently climb ramps, stairs, ladders, ropes, and scaffolds, and that he was limited to frequent handling and fingering with his left hand. AR 109-110, 121-22.

**D.   Testimony at the ALJ Hearing.**

**1. Mr. Cournoyer's Testimony:**

Mr. Cournoyer testified that he was 39 years old, completed only the 8th grade in school, and failed twice when he attempted to obtain a GED. AR 47,

50, 70. He testified that most of his schooling was in Job Corps and in a state institution at Plankinton. AR 70.

Mr. Cournoyer testified that he was 5' 8" tall, weighed 264 pounds, and was right-handed. AR 49-50.

Mr. Cournoyer testified that he received housing assistance, so he pays no rent and received TANF for his grandchild, as well as food stamps, energy assistance, and medical assistance. AR 49, 52-53.

Mr. Cournoyer testified he last attempted work as a bell-ringer for the Salvation Army and he only lasted two weeks or less because he could not stand long enough due to his back. AR 51. He also testified he attempted some day labor work and worked as a sorter at Goodwill for about six weeks as part of a program. AR 52.

Mr. Cournoyer testified he had past full-time work as a general laborer, driving a dump truck, and doing concrete form work. AR 53. He testified he left his work at Carlson Construction because his hands kept him from operating a jackhammer, and he left a job at Crump Construction because of his carpal tunnel when he was unable to "clinch" and his hands would swell. AR 67-68. He also testified that he tried a job through CU Temps, but he failed a dexterity test, so he could not do the assembly job. AR 69.

Mr. Cournoyer testified he had not made contact with vocational rehabilitation to see if they could help him be trained into a job he might be able to do (AR 54), but later corrected that and explained his job at Goodwill was through the vocational rehab program AR 65.

24

When asked about his most severe medical problems, he said his carpal tunnel and his back. AR 54. He explained that he had carpal tunnel symptoms in both hands, worse on the left, and had constant pain in the ring finger and middle finger, which were operated on twice but got worse, not better. AR 54-55. In his right hand he had "like a cyst" in the middle of the wrist and it locks up from time to time. AR 55. He said he had problems grasping with his left hand and gets swelling also. AR 67.

Mr. Cournoyer testified he had a bulging disk in his back and had pain which comes and goes. AR 56. He explained that standing and walking exacerbates the pain, which is a burning, aching sensation. AR 56-57. He said he had been on Tramadol for pain, and then was switched to Tylenol Extra Strength Arthritis alternating with ibuprofen, but that did not work and he was just put on Meloxicam. AR 57.

Mr. Cournoyer testified that he had difficulty sleeping due to back pain, hand pain, and his hands going numb. AR 59.

Mr. Cournoyer testified he enjoyed fishing from the shore, but that he had not fished this year and maybe fished twice in 2012. AR 62. He said he could drive, but would need to stop and take a break after maybe an hour or half hour. AR 62. He reported that he changed the oil in his vehicle. AR 62.

Mr. Cournoyer initially testified there were no other physical or mental problems impacting his ability to work (AR 58), but later explained he has problems with the left foot arch and with his right ankle since fracturing it and having a plate and screws put in. AR 65-66.

25

Mr. Cournoyer stated that he did not use any assistive devices like canes, crutches, or braces. AR 50. He stated that he reads "pretty good," could do simple math, and manage money. AR 51. When asked about problems writing, Mr. Cournoyer stated, "Yeah, sometimes I get – I don't write the words right." AR 51. He said that he could understand the storyline of television shows. AR 59.

Mr. Cournoyer testified that on a typical day he would get up, get the kids and his grandchild ready for school, and walk them to the bus. AR 60. He said he could take care of his personal care, make a bed, take out the garbage, cook a meal, vacuum, wash dishes, and do laundry, which requires him to access his washer and dryer in the basement of the house. AR 49, 60-61. He was not asked how often he did any of those tasks or if he had any problems doing them. AR 60-61. When asked if he grocery shops, he said yes, but that he did not stand. AR 61. He then explained that when he shopped he either needed to sit down or go out to the car and let his girlfriend finish, because he cannot stand that long. AR 61. He said that after 30 minutes of walking or standing, his foot will go to sleep and he gets sharp pain in his back and down the back of his leg. AR 61.

Mr. Cournoyer testified that he could only stand about a half hour and sit a half hour to an hour. AR 61, 63. He said he could only lift about 4-5 pounds with his left hand without aggravating his pain level, and 10-15 pounds with his right hand. AR 63. He said he would be able to bend and touch his toes and he could squat or crouch. AR 64.

26

**2. Vocational Expert Testimony:**

The ALJ's first hypothetical question and the one relied upon in the decision to the vocational expert ("VE") asked the VE to do the following:

> [A]ssume an individual same age, education, past work experience as the claimant. I want you to assume this individual is able to lift and/or carry 20 pounds occasionally, 10 pounds frequently; sit with normal breaks for a total of six hours in an eight-hour workday, but stand and/or walk with normal breaks for a total of only four hours in an eight-hour workday, and when standing and walking he should not do so on uneven terrain. With respect to use of his hands, he must never engage in the operation of vibration hand tools with either the right or the left hand. He can occasionally reach overhead and engage in push/pull activities with the bilateral upper extremities; and he is able to frequently handle, finger and feel with the bilateral hands. He's able to occasionally engage in the operation of foot controls with the bilateral lower extremities. He can occasionally climb stairs and ramps, balance, stoop, kneel, and crouch. He needs to avoid concentrated exposure to humidity and wetness, extreme cold, and extreme heat. He must never climb ladders or scaffolds, never crawl, never work at unprotected heights, and never work around dangerous moving mechanical parts.

AR 72-73. The VE testified the individual would be unable to perform Mr. Cournoyer's past work, but could perform the occupations of inspector and hand packager, electronics worker, and cashier. AR 73. The VE testified that the jobs he identified were typically in a seated position or did not involve a great deal of standing, and therefore the hypothetical person could perform those jobs even though they were classified as light and the question included a limitation to standing and/or walking for only 4 hours in an 8-hour workday. AR 74.

27

**E.   Other Evidence:**

**1. Vocational Rehabilitation Records:**

The record contains vocational rehabilitation records from November 30, 2011, through May 21, 2012, but does not contain any initial application for services or evaluation by the department. AR 303-12.

In a case note dated November 30, 2011, Mr. Cournoyer reported to his caseworker that some days he has more pain than others, for example two days earlier he had been unable to finish the dishes due to pain; however, he stated that it was not a problem most of the time. AR 303. He discussed disability with his caseworker and decided to apply, but he still wanted to work part-time. AR 303. The caseworker noted that Mr. Cournoyer had no customer service or computer skills, that pain limits his standing, and that carpal tunnel limits his dexterity and grip strength. AR 303. The caseworker then decided that the work adjustment program at Goodwill would be part of Mr. Cournoyer's assessment and would help determine his tolerance for standing. AR 303. The caseworker provided Mr. Cournoyer with two, 30-day bus passes. AR 303.

Mr. Cournoyer worked at Goodwill from January 16, 2012, to February 24, 2012. AR 310. During that time he missed three days. AR 310. In his detailed evaluation he was rated "Needs Improvement" in the categories of regular attendance and physical endurance/fatigue. AR 310. Mr. Cournoyer was rated excellent or acceptable in twenty-two of the twenty-four individually listed rating categories. AR 310-11. The report concluded that he was not ready

28

for competitive employment and that he should continue to try to obtain
disability benefits and follow through with his medical treatment to try to
reduce his pain. AR 311. The report noted that Mr. Cournoyer worked even
when he was hurting; however his physical endurance was taxed by his
constant pain. AR 311. Mr. Cournoyer had a good foundation of positive skills
from his years of work experience in the construction industry, understood the
importance of team work, and worked hard to do his part. AR 311. He took his
sizing task seriously, worked hard to complete work correctly, took on other
tasks, and accepted help to assure that his tasks were done correctly. AR 311.
He was punctual and communicated in a professional manner when he was
unable to come to work. AR 311. He needed little supervision because he was
able to learn his tasks quickly and make appropriate decisions in the work
environment. AR 311. He concentrated on his tasks and took responsibility to
make sure his work area was clean and orderly. AR 311. He made sure that his
work was done meticulously, kept his production high, and completed his
hourly rate evaluation above the store standard. AR 311. He had good hygiene
and arrived dressed appropriately for warehouse work. AR 311. He never
complained about assigned tasks or discussed pain unless he was asked about
it. AR 311. Mr. Cournoyer was courteous, pleasant, helpful to others, and
accepted direction from his supervisor pleasantly and worked hard to avoid the
need for correction. AR 311. The report concludes that Mr. Cournoyer will need
assistance in finding part-time employment which is more conducive to his
physical condition. AR 311.

On February 23, 2012, Mr. Cournoyer met with a caseworker to discuss his performance at the Goodwill job. AR 306. The caseworker reported that he had worked at a competitive rate, had good customer service skills, and got along well with coworkers. AR 306. He had missed one day due to heel pain, two other days due to weather and transportation problems, and he reported having a hard time working the four hours per day required. AR 306. Mr. Cournoyer also said his left wrist was hurting, but that he would like to be able to work full time and not need disability benefits. AR 306. He indicated that he would pursue carpal tunnel release for his wrist and a cortisone shot for his heel, with follow-up care if needed. AR 306.

### 2. Miscellaneous Other Evidence:

Mr. Cournoyer completed a Disability Report in which he reported chiropractic treatment at Van Hemert Chiropractic Clinic. AR 284. Mr. Cournoyer completed a Function Report on May 13, 2012. AR 295-302. He reported under the section on daily activities from the time he woke up until he went to bed that he "wakes up get kids up to go to school, do some cleaning, dishes, sweep, mop, go to appointments if have any." AR 295. He reported that he had two daughters that he took care of, but did not list what he does for them, and indicated he had no problem with personal care. AR 296. He needed no special reminders to take care of his grooming or medicine and prepared his own meals, but only monthly. AR 297. He reported that he prepared frozen dinners, eggs, and hamburger, and that he has quit cooking stuff you have to peel or that you have to mix a lot. AR 297. Mr. Cournoyer reported that he

mowed the lawn, which took 20 minutes, did laundry, and took out trash, which took 10 minutes, and that he did those things without help or encouragement. AR 297. He reported that he could go out alone, and did so for four hours a day. AR 298. He reported that he shopped in stores to buy food one time a month for 30 minutes. AR 298. Mr. Cournoyer indicated that he could pay bills, handle a savings account, count change, and use a checkbook. AR 298. He reported that his hobbies and interests were fishing, camping, and watching TV. AR 299. Under the section asking how often and how well he did those things, he reported, "2 year camping good fishing, 1 week good, watching TV 1 HR everyday good." AR 299. Under the section asking about changes in his hobbies and interests, he reported, "fishing, it hard to put hooks and weights bait." AR 299. He wrote that he could bend and stand for four hours or less and could follow written and spoken instructions. AR 300.

Mr. Cournoyer completed a Claimant's Recent Medical Treatment form in which he reported treatment from Vaani Jegapragasan, MD, on February 13, 2013, and provided her address. AR 331. He indicated he was being treated for vitamin D deficiency and arthritis. AR 331.

Mr. Cournoyer completed a Claimant's Recent Medical Treatment form in which he reported treatment from Dr. Robert E. Vandemark, Jr., on August 5, 2013, and provided his address. AR 339. He indicated he had surgery on his finger. AR 339.

## DISCUSSION

### A.    Standard of Review.

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Woolf, 3 F.3d at 1213.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Id.   If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.     Burden of Proof.**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).[5] The burden of proof shifts to the Commissioner at step five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

**C.     The Parties' Positions.**

Mr. Cournoyer asserts the Commissioner erred by finding him not disabled within the meaning of the Social Security Act. He asserts the Commissioner erred in three ways: (1) the Commissioner failed to fully and fairly develop the record; (2) the Commissioner's determination of

---

[5] See footnote 3, supra for a description of the five-step inquiry.

Mr. Cournoyer's RFC is not supported by substantial evidence; and (3) the Commissioner failed to properly identify and incorporate all of Mr. Cournoyer's severe impairments into his RFC.

The Commissioner asserts substantial evidence supports the ALJ's determination that Mr. Cournoyer was not disabled during the relevant time frame, and the decision should be affirmed.

**D.    Analysis.**

Mr. Cournoyer's arguments are addressed in turn below:

**1.  Whether the Commissioner fully and fairly developed the record.**

Mr. Cournoyer acknowledges he bears the burden of persuasion to prove disability and to demonstrate his RFC.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  He asserts, however, that the ALJ nevertheless bears the responsibility to fully and fairly develop the record.  Id.   This is true even when the claimant is represented by an attorney throughout the administrative proceedings.  Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010).  If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record.  McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  The ALJ is required to seek additional evidence or clarification only if a "crucial issue" is undeveloped.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Mr. Cournoyer relies upon 20 CFR § 404.1512(d) in support of his assertion that the ALJ failed in his duty to develop a crucial issue his case.  That regulation states in relevant part:

(d) *Our responsibility.* Before we make a determination that you are not disabled, we will develop your complete medical history for at

least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

(1) "Every reasonable effort" means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination. The medical source will have a minimum of 10 calendar days from the date of our followup request to reply, unless our experience with that source indicates that a longer period is advisable in a particular case.

(2) By "complete medical history," we mean the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application. If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier. If applicable, we will develop your complete medical history for the 12-month period prior to (1) the month you were last insured for disability insurance benefits (see § 404.130), (2) the month ending the 7-year period you may have to establish your disability and you are applying for widow's or widower's benefits based on disability (see § 404.335(c)(1)), or (3) the month you attain age 22 and you are applying for child's benefits based on disability (see § 404.350(e)).

Mr. Cournoyer's application was filed on February 24, 2012. He completed several forms identifying his medical providers. AR 282-83 and AR 326, 331, 339. He also testified at the hearing about treatment received from Chris Janssen (AR 57). Medical records in the file reference treatment from a rheumatology specialist (AR 582, 603-05). Among the medical providers identified by Mr. Cournoyer were Vaani Jegapragasan, MD (treatment for Vitamin D deficiency and arthritis); Robert Vandemark, MD (treatment for

35

surgery on his finger); Chris Janssen (medications).  Neither Mr. Cournoyer nor the ALJ, however, obtained any of these records before the ALJ made his decision.

Though the administrative record indicated it contained medical records from Sanford Family Medicine for the appropriate time frame, Mr. Cournoyer asserts that in reality, the medical records from his primary care physician (Dr. Schulz) were missing from the record for the two-year time period before the ALJ issued his decision. Mr. Cournoyer asserts the ALJ acknowledged in his written decision that the records from Dr. Schulz pertained to a "crucial issue" under Ellis because the ALJ specifically commented on both their importance and the significance of their absence.

When determining the credibility of Mr. Cournoyer's subjective complaints for purposes of determining his RFC, the ALJ commented on the lack of opinion evidence from Mr. Cournoyer's primary physician.   The ALJ painstakingly discussed several of the factors which bore upon Mr. Cournoyer's credibility (see 20 C.F.R. § 404.1529) (listing factors to consider).  One of the credibility factors is medical findings, including statements from the claimant's treating source.  Id. at § 404.1529(c)(1). The ALJ discussed Mr. Cournoyer's medical history as found in his records, but concluded "[it is important to note that the record does not contain any definitive statement from any of claimant's treating or examining physicians.  Their silence is deafening as to the issue of disability." AR 29.  The ALJ again noted this absence when he said "the record of evidence does not include medical opinions from any of the claimant's

36

physicians stating the claimant has any sort of limitations due to his physical impairments." AR 30.  The ALJ equated this absence of opinion, or "deafening silence," to an assumption that the treating and/or examining physicians, if asked, would not be supportive of Mr. Cournoyer's disability application.

But the Eighth Circuit has repeatedly criticized this practice.  In Hutsell v. Massanari, 259 F.3d 707 (8th Cir. 2001), the court reversed the Commissioners' denial of benefits and remanded for an award of benefits to the claimant.  Id. at p. 714.  In that case, there was no record opinion from the claimant's treating physician.  The court explained, however, that "[a] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  See also, Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009); Lauer v. Astrue, 245 F.3d 700, 705 (8th Cir. 2001) (same).

After the ALJ denied his claim, Mr. Cournoyer obtained records from Dr. Jegapragasan, Dr. Schulz, and Dr. Janssen for submission to the Appeals Council.  See, AR 700-856.  He also submitted a medical source statement from Dr. Schulz, explaining Dr. Schulz's opinions about Mr. Cournoyer's work abilities.  AR 857-59.  Dr. Schulz's opinions did not coincide with the opinions of the state agency physicians.  Id.  The state agency physicians' opinions were the only ones in the record when the ALJ made his decision and, though they

were given only "some weight" they were, for the most part, adopted by him. AR 29.

The Commissioner argues the ALJ fulfilled his duty to develop the record because Mr. Cournoyer bore the burden to prove his RFC.  Baldwin v. Barnhart, 349 F.3d 549 (8th Cir. 2003).  This theory was rejected by the Eighth Circuit in Snead v. Barnhart, 360 F.3d 834 (8th Cir. 2004).  In Snead, the claimant made a claim for disability benefits based in part on his congestive heart failure condition.  The ALJ recognized this condition as a severe impairment but "gave no consideration to what effect this underlying heart condition might have on [his] ability to work."[6]  The Eighth Circuit reversed because it found that once the ALJ was aware of the claimant's heart condition, he should have taken steps to develop the record sufficiently to determine how it limited the claimant's ability to work even if the claimant failed to sufficiently do so himself.  Id. at 839.

The Court forcefully explained that unlike normal Anglo-American legal proceedings, Social Security hearings do not rely on the rigors of the adversarial process to reveal the true facts of a case.  Id. at 838 (citing Schaal v. Gammon, 233 F.3d 1103, 1106 (8th Cir. 2000)) (other citations omitted). Instead, in Social Security proceedings, it is the ALJ's duty to find the truth by

---

[6] The claimant's treating physician offered an opinion on the ultimate issue (i.e. that the claimant "could not work" because of the heart condition, but that opinion was rejected by the ALJ without seeking any clarification or further support for it.  Id. at 839.

38

fully and fairly developing the record, "independent of the claimant's burden to press his case." Id. at p. 838 (citations omitted).

> The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. See Richardson v. Perales, 402 U.S. 389, 410, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir.1994) (noting that the Commissioner and claimants' counsel both share the goal of assuring that disabled claimants receive benefits).

Id. Once the ALJ recognized Mr. Cournoyer's treating physician records were missing from the record, (and clearly recognized the importance of his treating physician's opinion about Mr. Cournoyer's work abilities) therefore, it was the ALJ's duty to develop the record further to obtain this information. Snead 360 F.3d at 839.

The Commissioner further asserts Mr. Cournoyer must show prejudice to warrant reversal because of the ALJ's failure to develop the record. LaCroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006). In LaCroix, the court found no prejudice because the evidence the claimant urged should have been developed was not from an acceptable medical source. Id. at 886. This case is distinguishable from LaCroix because Mr. Cournoyer's missing evidence was from his primary treating physician—Dr. Schulz, who was an acceptable medical source. When Dr. Schulz did provide his opinion it was very different from the opinions of the state agency physicians, who never treated and never examined Mr. Cournoyer.

Pursuant to the applicable Social Security Regulation, Dr. Schulz' opinion, had it been in the record, may have had a substantial impact on

39

Mr. Cournoyer's case because ordinarily the opinions of treating physicians are given controlling weight.  See 20 C.F.R. § 404.1527(c).  "Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding."  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).

> Indeed, when the treating physician's opinion is supported by proper medical testing and is not inconsistent with other substantial evidence in the record, the ALJ *must* give the opinion controlling weight . . . However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.

Id. (citations omitted, punctuation altered, emphasis added).  "Ultimately, the ALJ must 'give good reason' to explain the weight given the treating physician's opinion."  Id. (citing 20 C.F.R. § 404.1527(c)(2)).   Additionally, SSR 96-2p instructs that

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically accepted clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

See SSR 96-2p, POLICY INTERPRETATION, at p. 6.

Conversely, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.  "We have stated many times that the results of a one-time medical evaluation

do not constitute substantial evidence on which the ALJ can permissibly base his decision." Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted). "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." Id. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

In Mr. Cournoyer's case, the ALJ gave "some weight" to the opinions of the non-treating, non-examining state agency consultants in order to find Mr. Cournoyer was not disabled. AR 28. But he did not have the opportunity to consider the opinion of the treating physician (Dr. Schulz).[7] Mr. Cournoyer has therefore sufficiently shown the prejudice required by LaCroix to require reversal and remand for proper consideration of Dr. Schulz' opinion. The ALJ will also have the benefit of all of the other medical records which were not part of the record at the time the first ALJ decision was made, but which were submitted to the Appeals Council. These records should likewise be fully considered and given appropriate weight pursuant to 20 C.F.R. § 404.1527 on remand.

---

[7] In her brief, the Commissioner asserts even the supplemented record does not support a finding of a back impairment or any physical limitations related to a back impairment, so Mr. Cournoyer has not shown prejudice by the ALJ's failure to supplement the record. Docket 14 at pp. 6-8.

Whether Mr. Cournoyer has a medically determinable back impairment and if so, the physical limitations related to any such impairment are issues that should be re-evaluated on remand, after the ALJ has all of the relevant medical records. This issue is discussed in further detail in Section 3 below.

## 2. Whether the Commissioner's determination of Mr. Cournoyer's RFC is supported by substantial evidence.

Mr. Cournoyer asserts the Commissioner's RFC formulation is not supported by substantial evidence because (1) the Appeals Council did not properly evaluate the medical source statement submitted by Dr. Schulz; (2) the ALJ relied in part on the opinions of non-treating, non-examining state agency physicians; and (3) the ALJ assigned physical limitations in part by improperly drawing his own inferences from the medical records.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer, 245 F.3d at 703 (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. October 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question." Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's

42

ability to function in the workplace." Id. (citations omitted).  Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered).

Mr. Cournoyer's first criticism is that the Appeals Council did not properly weight Dr. Schulz's medical statement.  In cases involving submission of supplemental evidence subsequent to the ALJ's decision, the record may include evidence submitted after the hearing and considered by the Appeals Council.  Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000).  "In practice, this requires [the court] to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." Id.

The applicable regulation (20 C.F.R. § 404.970(b)) requires the Appeals Council to consider additional evidence submitted only if it is new, material, and "*relates to the period on or before the date of the administrative law judge hearing decision . . .*" (emphasis added).  The date of the medical examination is not dispositive of whether the evidence is material, but rather whether the information contained in the submitted records relates to the claimant's condition during the relevant time.  Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).  The Eighth Circuit has explained:

> At this point, our only task is to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ.  As we have noted, this is a

peculiar task for a reviewing court . . .But we do include such
evidence in the substantial evidence equation.

Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995) (citations omitted,

punctuation altered.

In Mr. Cournoyer's case, the Appeals Council accepted and reviewed the

evidence Mr. Cournoyer submitted.  See AR 1-6.  In denying Mr. Cournoyer's

claim for benefits, however, the Appeals Council explained:

> We found no reason under our rules to review the Administrative
> Law Judge's decision.  Therefore, we have denied your request for
> review.
>
> This means the Administrative Law Judge's decision is the final
> decision of the Commissioner of Social Security in your case.
>
> ***
>
> In looking at your case we considered the reasons you disagree
> with the decision and the additional evidence listed on the
> enclosed Order of the Appeals Council.  We considered whether the
> Administrative Law Judge's action, findings, or conclusion is
> contrary to the weight of the evidence currently of record.  We
> found that this information does not provide a basis for changing
> the Administrative Law Judge's decision.

It is essential to recall the ALJ's comments about the significance of the

absence of an opinion from Mr. Cournoyer's treating physician about

Mr. Cournoyer's limitations.  The ALJ said Dr. Schulz's silence was "deafening."

It is important to know, then, how Dr. Schulz's opinion was weighed,

considering the record as a whole.  The factors to consider for assigning weight

to medical opinions are set forth by regulation:

> (c) How we weigh medical opinions.  Regardless of its source, we
> will evaluate every medical opinion we receive.  Unless we give a
> treating source's opinion controlling weight under paragraph (c)(2)

44

of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship.  **Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.**  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a non-treating source.

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a non-treating source.

(3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.

45

The better explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because non-examining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

See 20 C.F.R. § 404.1527(c) (Emphasis added).

Though the Appeals Council possessed records and an opinion from Mr. Cournoyer's treating physician, it did not explain why Dr. Schulz's opinion should not be afforded controlling weight under 20 CFR § 404.1527, nor did it give "good reasons" for assigning no weight at all Dr. Schulz' opinions under 20 C.F.R. § 404.1527(c)(2) when formulating Mr. Cournoyer's RFC. On remand, all the medical evidence should be reviewed and the weight given to Dr. Schulz's opinion should be explained pursuant to 20 CFR § 404.1527.

Next, Mr. Cournoyer asserts the ALJ erred when he relied in part upon the opinions of non-treating, non-examining state agency physicians when

46

formulating the RFC.  The ALJ assigned "some weight" to these opinions.
AR 29.  At the initial level, the state agency physician (Dr. Whittle) found
Mr. Cournoyer's carpal tunnel was non-severe (AR 84) and therefore assigned
no associated limitations (AR 87).  At the reconsideration level, the state agency
physician (Dr. Erickson) again indicated Mr. Cournoyer's carpal tunnel was
non-severe (AR 107), but nevertheless imposed manipulative limitations
(AR 110).  Dr. Erickson indicated Mr. Cournoyer was limited to "frequent"
handling and fingering with his left hand.  Id.

     In formulating the RFC, the ALJ purportedly adopted the state agency
physician's opinion when he gave it "some weight."  AR 29.  But the ALJ found
Mr. Cournoyer's carpal tunnel was a severe impairment (*contrary* to the state
agency physician's opinion) and (also contrary to the state agency physician),
imposed manipulative limitations on both upper extremities instead of only the
left side, as the state agency physician had done.  Compare AR 107-110 (state
agency physician's assessment) to AR 23, 25 (ALJ's assignment of severe
impairments and formulation of Mr. Cournoyer's RFC).

     The ALJ's formulation of the RFC must be based on *some* medical
evidence (Lauer, 245 F.3d at 703), but "[i]t is improper for the ALJ to rely on
the opinions of reviewing physicians who have neither treated nor examined
the claimant."  Savage v. Colvin, 41 F. Supp. 3d 763 (S.D. Iowa, Sept. 3, 2014).
In Savage, the ALJ relied upon the opinions of state agency non-examining,
non-treating physicians to formulate the claimant's RFC.  Id. The district court
reversed and remanded for an award of benefits.  Id. at 774.  It noted "the

47

Eighth Circuit Court of Appeals has, time and time again, held that the opinions of such physicians do not constitution substantial evidence supportive of a denial of benefits." Id. at 773 (citing Landess v. Weinberger, 490 F.2d 1187, 1189-90 (8th Cir. 1984); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); and Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003)). The Eighth Circuit has explained that reliance on the opinion of a non-examining, non-treating physician to determine RFC does not normally constitute substantial evidence on the record.  "The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [claimant's] RFC.  In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record." Nevland, 204 F.3d at 858.  This court agrees, especially in this instance where there is no explanation in the record for the Commissioner's rejection of the treating physician's more restrictive limitations.

Mr. Cournoyer's final criticism regarding the ALJ's formulation of the RFC is that the ALJ "played doctor" when he inserted his own opinion regarding Mr. Cournoyer's physical limitations into the formulation. Specifically, the state agency physicians did not support the limitations imposed by the ALJ, and the opinion of the treating physician was not yet in the record.  The limitations imposed, therefore, were borne of the inferences drawn by the ALJ's interpretation of the medical records.  This practice,

48

however, is "forbidden by law." <u>Pate-Fires</u>, 564 F.3d at 947 (citations omitted).

Further, when there is no medical evidence in the record the ALJ "cannot

simply make something up." <u>Everson v. Colvin</u>, 2013 WL 5175916  at * 20

(D.S.D., Sept. 13, 2013).  "[A]n ALJ must not substitute his own judgment for a

physician's opinion without relying on other medical evidence or authority in

the record." <u>Clifford v. Apfel</u>, 227 F.3d 863, 870 (7th Cir. 2000).  The ALJ must

not "succumb to the temptation to play doctor and make their own

independent medical findings." <u>Pate-Fires </u>, 564 F.3d at 947 (citations omitted).

An ALJ also "may not draw upon his own inferences from medical reports."

<u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th Cir. 1975).

The Commissioner cites <u>Martise v. Astrue</u>, 641 F.3d 909 (8th Cir. 2011);

<u>Schmidt v. Astrue</u>, 496 F.3d 833 (7th Cir. 2007); <u>Robinson v. Astrue</u>, 365 Fed.

Appx. 993 (11th Cir. 2010); and SSR 96-5p for the proposition that the ALJ's

substitution of his own judgment for a physician's medical opinion without

relying on other medical evidence or authority in the record is in fact,

acceptable.  Those authorities, however, do not support the Commissioner's

position.

In <u>Martise</u>, the claimant argued the ALJ erred because he did not adopt

the opinion of one of the claimant's treating physicians.  The ALJ did, however,

"credit the opinions of Martise's other treating and examining physicians, none

of which indicated Martise had serious functional restrictions." <u>Martise</u>, 641

F.3d at 927.  Similarly, in <u>Schmidt,</u> the claimant argued the ALJ erred by

rejecting the opinions of her treating physician and psychologist.  <u>Schmidt,</u> 496

F.3d at 835.  The court affirmed the denial of benefits and reiterated the ALJ was not required to adopt the opinion of the claimant's physician, or even "rely entirely on a particular physician's opinion." Id. at 845.  Though the ALJ did not adopt the wholesale opinions of either of the claimant's physicians in formulating her RFC, the court was careful to explain that the physical limitations incorporated into the RFC were supported in part by her treating physician's opinion, and in part by the opinions of other medical providers of record. Id. at 845.  The limitations being urged by the claimant, conversely, were not supported by any medical opinion in the record. Id.

Finally, in Robinson, the claimant argued the ALJ erred by failing to recontact the treating and consulting physicians to determine her RFC. Robinson, 365 Fed. Appx. at 998-99.  The Eleventh Circuit affirmed the denial of benefits, noting that the ALJ is not required to order a consultative exam "as long as the record contains sufficient evidence for the ALJ to make an informed decision." Id. at 999.  The court reiterated the often cited phrase that "the task of determining a claimant's residual functional capacity and ability to work is within the province of the ALJ, not of doctors." Id.   This principle is well-settled and is established by 40 CFR § 404.1527(d)[8] and SSR 96-5p.[9]  It does

---

[8] 20 CRF § 1527(d) states:
(d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as that examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section but are, instead, issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e. that would direct the decision of disability.
(1) Opinions that you are disabled . . .
(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence,

not, however, relieve the ALJ of his or her duty to base the RFC on *some*

medical evidence.  <u>Clifford</u>, 877 F.3d at 870.

---

including opinions, on the nature and severity of your impairment(s). Although we consider opinions from your medical sources on issues such as whether your impairment(s) meets or equals the requirements in the Listings of Impairments . . .your residual functional capacity,  . . .or the application of vocational factors, the final responsibility for deciding these issues is reserved for the Commissioner.
(3) ***

9 SSR 96-5P states in part:  Under 20 CFR 1527(e) some issues are not medical issues regarding the nature and severity of an individual's impairment but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.  The following are examples of such issues:

***

2.      What an individual's RFC is;

***

The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner.

Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner.  For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commisisoner and the bases for such opinions are not clear to us.

However, treating sources opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

However, opinions from any medical source in the record must never be ignored.  The adjudicator is required to evaluate all evidence in the case record that may have bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.  If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

***

51

The RFC formulated by the ALJ in this case is not supported by substantial evidence for three reasons:  (1) though the ALJ acknowledged the significance of their absence, the records from the treating physician (Dr. Schulz) for the appropriate time frame were not made part of the record before  the ALJ made his decision.  When Dr. Schulz' medical source statement and his medical records were provided to the Appeals Council, the Appeals Council provided no analysis to determine the appropriate weight the opinion should be given pursuant to 20 CFR § 404.1527; (2) the "less than full range light duty" RFC which was adopted by the ALJ was assigned solely by the non-treating, non-examining physicians; and (3) the ALJ compounded the error by adding modifications to the light duty RFC which were not supported by any record medical evidence whatsoever.  On remand, the ALJ should revisit the formulation of Mr. Cournoyer's RFC.

### 3. Whether the Commissioner properly identified and incorporated all of Mr. Cournoyer's severe impairments into his RFC.

Mr. Cournoyer's final assignment of error is that some of his severe impairments were not identified, and their physical limitations were therefore omitted from his RFC formulation.  Mr. Cournoyer specifically identifies his back impairment.

In his written decision, the ALJ made the following comments about Mr. Cournoyer's back:

> The claimant also reported he experiences back pain from what he states is a bulging disc in this lower back (testimony).  He reports that walking and standing exacerbate his back pain.  In fact, the claimant presented to a chiropractor in November, 2012 with back pain after standing too long as a seasonable [sic] bell ringer

> (testimony); Exhibit 5F).  However, the claimant's back was
> adjusted by manual manipulation and he was told to return if
> needed.  The record does not document that the claimant returned
> for further treatment; nor is there a diagnosis of a back
> impairment in the record from an acceptable medical source.
> Therefore, the undersigned finds that the claimant's alleged back
> pain is not a medically determinable impairment.

AR at 24.  After the ALJ's written decision, Mr. Cournoyer submitted records

from Dr. Schulz which assessed lumbar pain with radiation down the left leg

(AR 772) and records from the physical medicine rehabilitation specialist

(Christopher Janssen) who diagnosed left lumbar radiculitis without evidence

of neurologic compromise (AR 840).  Despite these additional records, the

Appeals Council did not alter the ALJ's findings.  AR 1-3.

Medically determinable impairments are defined as those resulting from

anatomical, physiological, or psychological abnormalities, which can be shown

by medically acceptable clinical and laboratory diagnostic techniques.  A

physical or mental impairment must be established by medical evidence

consisting of signs, symptoms, and laboratory findings, not only by a

claimant's statement of symptoms.  See 20 CFR § 404.1508.  When

determining a claimant's RFC, the ALJ must consider the effects of all the

claimant's medically determinable impairments, both severe and non-severe.

20 CFR § 404.1545(e); SSR 96-8p.[10]

---

[10] SSR 96-8p states in part:
> In assessing RFC, the adjudicator must consider
> limitations and restrictions imposed by all of an
> individual's impairments, even those that are not
> 'severe.'  While a 'not severe' impairment standing
> alone may not significantly limit an individual's ability
> to do basic work activities, it may—when considered

In her brief, the Commissioner emphasizes that to be designated as a medically determinable impairment, Mr. Cournoyer's reports of back pain are not enough.  Instead, 20 CFR § 1529(a) requires medical signs and laboratory findings which show the existence of the medical impairment.  Further, 20 CFR § 404.1528 clarifies the distinction between "symptoms," "signs," and "laboratory findings."  That regulation states:

> **§ 404.1528  Symptoms, signs, and laboratory findings.**
> (a) Symptoms are your own description of your physical or mental impairment.  Your statements alone are not enough to establish that there is a physical or mental impairment.
> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g. abnormalities of mood, behavior, thought, memory, orientation, development, or perception.  They must also be shown by observable facts that can be medically described and evaluated.
> (c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques.  Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiograms, electroencephalogram, etc.), roentgenological studies (x-rays), and psychological tests.

See 20 CFR § 1528.

---

> with limitations or restrictions due to other impairments, --be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'non-severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

See SSR 96-8 at p. 8.

The Commissioner notes that though Dr. Janssen opined Mr. Cournoyer's *symptom* of back pain was caused by lumbar radiculitis, he advised Mr. Cournoyer to return for diagnostic imaging (specifically, an MRI of the lumbar spine) if his symptoms did not improve, but there is no record evidence that the testing ever occurred.  Therefore, the Commissioner argues, even with the medical records as supplemented to the Appeals Council there is nothing in the record except Mr. Cournoyer's *symptoms* which are insufficient to establish a medically determinable impairment, let alone a severe impairment, under 20 CFR § 404.1528 and 1529.

The medical records which contain information about Mr. Cournoyer's back condition are sparse.  This court's review of them indicates there may not be sufficient medical evidence in the record which qualifies as "signs" or "laboratory findings" as those terms are defined by 20 CFR § 404.1528 and which are required by 20 CFR § 404.1529 for Mr. Cournoyer's back condition to be considered a medically determinable impairment—whether severe or non-severe.[11]  This, however, is an issue better left for the ALJ on remand in light of the evidence which was not submitted until the Appeals Council stage of the proceedings.

---

[11] As mentioned above, Mr. Cournoyer did not follow up with Chris Janssen's suggested diagnostic MRI of the lumbar spine.  The only medical evidence in the record which appears to be anything other than Mr. Cournoyer's own description of his back pain (i.e. a *symptom*, which is alone insufficient) is the OBJECTIVE or PHYSICAL EXAMINATION portion of Dr. Schulz' and Chris Janssen's examinations on those visits where Mr. Cournoyer complained of back pain (November 27, 2012, May 16, 2013, and September 25, 2013).  AR  771, 811 and 840.  Those examinations, however, appeared to be mostly normal.  Id.

On remand the ALJ should consider anew and explain in his determination of Mr. Cournoyer's disability claim (1) whether Mr. Cournoyer's back condition is a medically determinable impairment; (2) if it is a medically determinable impairment, whether it is severe or non-severe; and (3) how, if at all, it affects Mr. Cournoyer's RFC.

**E.     Type of Remand.**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Mr. Cournoyer requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).   A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not

56

presented during the administrative proceedings.  Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the district court that Mr. Cournoyer's motion to reverse and remand (Docket 11) be GRANTED and that the Commissioner's motion to affirm (Docket 13) be DENIED.  It is further RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 13th day of January, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge